## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 27 2017, 8:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Marjorie Newell
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of K.T., Father, and L.T., Child,

K.T.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

January 27, 2017

Court of Appeals Case No.
49A02-1607-JT-1551

Appeal from the
Marion Superior Court

The Honorable
Gary Chavers, Judge Pro Tempore
The Honorable
Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1510-JT-633

**Kirsch, Judge.**

K.T. ("Father") appeals the juvenile court's order terminating his parental rights to his child, L.T. ("Child"). He raises two issues that we consolidate and restate as: whether sufficient evidence was presented to support the termination of Father's parental rights.

We affirm.[1]

## Facts and Procedural History

Father and J.S. ("Mother") are the biological parents of Child, who was born in November 2010. Indiana Department of Child Services ("DCS") initially became involved with Child on January 24, 2014, after it received a report that Mother tested positive for cocaine and heroin. *DCS Ex.* 1. At that time, Mother had custody of Child, and Father's whereabouts were unknown. *Id.*

On January 28, 2014, DCS filed a petition alleging that Child was a child in need of services ("CHINS"), asserting that Mother admitted to a history of substance abuse and untreated mental health concerns and "has [] failed to follow through with [Child]'s medical needs, to include surgery" and that "[t]he family also has unstable housing." *Id.* With regard to Father, the petition alleged that Father did not have custody of Child and was unable to protect

---

[1] Prior to terminating Father's parental rights, the juvenile court terminated the parental rights of Child's mother; she does not participate in this appeal.

Child while she was in Mother's care and control. *Id*. At the time of the initial hearing, Child was placed with her paternal grandmother, where she remained for approximately a week, and then Child was moved to her maternal grandmother's home. *Tr*. at 19. Upon Mother's admission, the CHINS court adjudicated Child a CHINS as to Mother on February 14, 2014, and, on March 7, 2014, Father waived fact-finding, and the court adjudicated Child CHINS as to Father. *DCS Ex*. 4.

[5] On March 28, 2014, the CHINS court proceeded to disposition as to Father, entering dispositional and parental participation orders that required Father to enroll in, participate in, and successfully complete a Father Engagement Program. *DCS Ex*. 6. Approximately six months later, on September 26, a review hearing was held, and it was determined that Father was not enrolled in and had not participated in the Father Engagement Program. The CHINS court also observed:

> A [team meeting] had been held on September 9, 2014, and concerns were brought up about [Father's] substance use. DCS requested that [F]ather submit to a screen at that time and [F]ather refused to screen on that day. [Father] was also aggressive at the [meeting] and DCS has concerns about anger issues.

*DCS Ex*. 7. DCS requested at the September 26 review hearing that Father submit to a drug screen that date. The guardian ad litem ("GAL") testified to observing Father with Child and recognizing that "there is a bond." *Id*. The CHINS court ordered Father "to submit to random drug screens as requested

by the DCS[,]" and it rescinded its authorization for unsupervised parenting time for Father "if he refuses to submit to a drug screen when requested." *Id*.

[6] In April 2015, following a review hearing, Child began temporary in-home trial visits with Father. About a month later, on May 29, 2015, another periodic review hearing was held at which DCS indicated that Father was consistent with his parenting time, had tested positive for benzodiazepines but had a valid prescription for it, and had been participating with the Father Engagement Program. DCS reported that it had no objection to Father having custody of Child and did not object to case closure. *DCS Ex*. 8. The CHINS court denied case closure at that time but informed the parties that a temporary custody order would be issued at the next hearing. Later that same day, Father was arrested after marijuana was found in his vehicle during a traffic stop. Child was in Father's vehicle at the time.

[7] On June 1, 2015, the State charged Father with two counts of Level 6 felony dealing in marijuana, one count of Level 6 felony possession or use of a legend drug, and one count of Class A misdemeanor taking a minor to a nuisance. That day, DCS filed notice of emergency removal. Initially, Child was placed with paternal relatives, but following a June 5 hearing, the CHINS court ordered Child to be moved to the maternal grandmother's care. *DCS Ex*. 10. In July 2015, DCS referred Father to a provider for random drug screens because of his May 29 arrest. At some point in July or August 2015, Child had been placed in foster care because maternal grandmother "tested positive for a high level of crack cocaine[,]" and DCS had received "allegations of physical

abuse[.]" *Tr.* at 30. DCS also had received information that Child was not residing in the home that had been identified and approved by DCS.

[8] At an August 2015 review hearing, DCS informed the CHINS court that Child was in foster care. The family case manager Caitlin Cincebox ("FCM Cincebox") stated that Father was living with "the potential relative caregiver," which was preventing placement of Child there, and that Father "will not vacate the family residence."[2] *DCS Ex.* 11. DCS requested that Father participate in home-based therapy to help Father understand Child's trauma and to address Father's reported symptoms of depression. DCS also requested that Father participate in home-based case management to address obtaining housing. *Id.* The CHINS court ordered Father to complete the requested home-based therapy and home-based case management, authorized Father to have parenting time in the community, and it continued Child's placement in foster care with authorization for relative placement. After two or three months in foster care, Child returned to living with paternal aunt in October or November 2015.

[9] On November 13, 2015, the CHINS court held a permanency hearing, finding that Father had been inconsistent with services and had refused to take responsibility through treatment for his substance abuse issue. The court ordered Father to complete a substance abuse assessment and to submit to

---

[2] At some point, Father was released on bond following his May 2015 arrest, although the exact date of his release is not clear from the record before us. *See Tr.* at 75.

random drug screens, and the court changed Child's permanency plan from reunification to adoption. *DCS Ex.* 12; *Tr.* at 33. Father's visitation with Child was, since May 2015, to be supervised by an agency and not by family. He had some no-shows, and there were reports that Father had been seeing Child outside of the parameters of court-ordered visitation. *Tr.* at 34. In late 2015 or early 2016, DCS requested, and the CHINS court ordered, that visitation be suspended until such time as Father produced three random clean urine screens because Father "was not participating in services" and DCS "didn't have any screens." *Tr.* at 32. By January 2016, DCS was receiving reports that Father had been residing with the paternal aunt in the home with Child, although the conditions of that placement required the family to monitor and ensure that Father was not seeing child outside the parameters of the court-ordered visitation. Child was removed from paternal aunt and placed back in the same foster home in which she previously had been living.

[10] Meanwhile, on October 16, 2015, DCS filed a petition to terminate Father's parental rights. *Appellant's App.* at 19-22. About one month later, on November 24, 2015, Father pleaded guilty to Level 6 felony dealing in marijuana and Class A misdemeanor taking a child to a nuisance. *DCS Exs.* 14, 15. Father was incarcerated from February 1, 2016 to May 26, 2016. The juvenile court held an evidentiary hearing on the termination petition on June 6, 2016. Frankfort Police Department Officer Cesar Munoz testified that, on May 29, 2015, he responded to a traffic stop upon dispatch reports of a reckless driver. The driver of the vehicle was Father. His girlfriend was in the front passenger

seat, and Child was in the back seat. When Officer Munoz made contact with the vehicle's occupants, he smelled a "strong odor" of raw marijuana coming from the vehicle. *Tr.* at 11. Police recovered two plastic baggies of raw marijuana from the front passenger area of the car, as well as "a bunch of sandwich baggies" from inside the car. *Id.* at 13. They also discovered 328 grams of raw marijuana and scales from the trunk. Officer Munoz was aware that Father subsequently was charged with, among other things, dealing in marijuana.

[11] FCM Cincebox, who was the FCM on Child's case from April 2015 to May 2016, also testified at the termination hearing. FCM Cincebox stated that, in April 2015, Father was compliant with the Father Engagement Program, although Father told FCM Cincebox that he thought the program was "a waste of his time." *Id.* at 22. Temporary in-home trial visits with Father began April 26, 2015, but Father was arrested and jailed on May 29, the same day that he had attended a review hearing. Father bonded out of jail not long after his arrest and lived with his parents. DCS referred Father for random drug screens because of his May 29 arrest. FCM Cincebox explained that DCS "want[ed] to see . . . that [Father] was sober and that he was not using substances[.]" *Id.* at 27. However, Father did not participate in the random drug screens and had several no-shows. *Id.* Father indicated to DCS that "it was too far for him to drive" from his residence in Boone County to Marion County, and he was experiencing transportation issues. *Id.* Therefore, DCS made referrals in both Marion County and Boone County "in an effort to allow [Father] to participate

with convenience" and "no barriers." *Id*. However, FCM Cincebox testified that Father continued to remain noncompliant.

[12] FCM Cincebox testified that, in November 2015, the CHINS court had modified disposition to include the drug screens, and it ordered a substance abuse assessment as well. FCM Cincebox testified that Father did not participate in drug screens, even after the juvenile court ordered it, and as for a substance abuse assessment, she said that Father "did not even attempt to schedule an appointment." *Id*. at 28. As a result, FCM Cincebox recommended in December 2015 that Father's visitation be suspended until he could produce three random drug screens, explaining that Child needed consistency and "someone she could depend on," that Father's "blatant violation" of the court orders was "concerning," and that Father had failed to participate in services. *Id*. at 34-35.

[13] As to the court-ordered home-based therapy, FCM Cincebox testified that Father visited his home-based therapist "maybe once or twice and then didn't answer their phone calls or [their] attempts to contact him" and did not follow the recommendations of his therapist. *Id*. at 18, 25. Father's referral for home-based therapy was closed due to non-compliance. As to the court-ordered home-based case management, FCM Cincebox testified that Father met with a home-based case manager, but not consistently. *Id*. at 26. It also was closed for non-compliance.

[14] FCM Cincebox recounted the back-and-forth living arrangements that Child had been through during the course of the proceedings, including her removal from the paternal aunt's home in January 2016 and placement back in the foster home, noting that Father "was very aware" that he was not to be living in the paternal aunt's home and doing so would jeopardize Child's placement there. *Id*. at 32. FCM Cincebox explained that she eventually recommended that the permanency plan change to adoption because the case had "been open for a very long time," and Child needed a family that would provide consistency and meet her needs. *Id*. at 33. FCM Cincebox testified that during the course of DCS's work on the case, Father had "verbally accosted" her and was verbally aggressive on "multiple occasions" both in person and over the telephone. *Id*. at 28, 37. In May 2016, three weeks before Father's trial, FCM Cincebox transitioned the case to FCM Madison Hamblin ("FCM Hamblin"). At that time, Father was incarcerated and his visitations were suspended, the permanency plan was adoption, and Child "was thriving" in her current placement. *Id*. at 35.

[15] FCM Hamblin testified that Father did not contact her or anyone at DCS either while he was incarcerated or following his release from incarceration. *Id*. at 55, 58. FCM Hamblin described that Child is "doing very well" in her current placement with a foster family, had "made a lot of progress" in her placement and at school, and is bonded with her caregivers. *Id*. at 55. FCM Hamblin testified that Father had not shown DCS that he had made "any progress" with regard to DCS's "original concerns[,]" explaining that "DCS has not been able

to get any drug screens from [Father], so . . . we are not able to ensure [h]is overall sobriety." *Id*. at 56-57. As a result, FCM Hamblin concluded that termination was in Child's best interests. *Id*. at 57. She stated that the permanency plan was adoption. *Id*.

[16] DCS also called as a witness the home-based therapist, Ranada Dalton ("Dalton"), who was referred by DCS to work with Child. Dalton explained that her job is to work with children who have been the victim of abuse and neglect and to develop treatment plans. Before beginning therapy with a child, her practice is to talk to the FCM that is involved as well as family members or the foster family to understand the family dynamics. At the time of Dalton's involvement, Child was living with the foster family. Child, at that time, had demonstrated issues with "being age appropriate" such that Child would "act like an adult" and also had problems listening and following directions. *Id*. at 48. Dalton testified that during her sessions with Child, which were often play therapy, Child "rarely" discussed Father. *Id*. at 50. Dalton testified that Child's behavior issues at school and home had decreased and that Child is "very happy" with her placement with the foster family. *Id*. at 48, 51. Dalton said that she had no concerns with Child's placement and recommended that it be continued. She acknowledged that she had not seen Child interact with Father. Dalton supported adoption as a permanency plan. *Id*. at 51-52.

[17] At trial, Child Advocates presented the testimony of GAL Sandra Donaldson ("GAL Donaldson"). She testified that her last contact with Father was in court in June 2015. Although GAL Donaldson provided Father with the

information on how to reach her, Father had not contacted her. GAL Donaldson had visited with Child during the course of the case at least ten times, including at her foster placement. GAL Donaldson characterized the foster placement as "pre-adoptive." *Id*. at 68. GAL Donaldson had no safety concerns with the placement, believed Child's needs are being met, and stated that Child is "bonded with everyone" in the home including the children there. *Id*. GAL Donaldson described Child as happy, engaging, and creative. *Id*. GAL Donaldson stated that termination is in Child's best interest because Father "just hasn't followed through," and Child "needs a place where she could be stable, loved and cared for." *Id*. at 69. She explained that although Father, in the beginning, demonstrated that he loved Child, and they exhibited a bond, "things . . . definitely changed" after Father's arrest in May 2015. *Id*. at 70. Further, GAL Donaldson was concerned with Father's decision to move into the home where Child was living even though "he knew that [Child] could be removed[.]" *Id*. GAL Donaldson did not feel that Father should be given another opportunity. With regard to a permanency plan, GAL Donaldson recommended adoption by Child's foster caregivers.

[18] At termination, Father testified that, at that time, he was living with his parents in Lebanon, was working for their family business in Frankfort, and had transportation. He stated that he was willing to engage in and complete whatever services that DCS wanted him to do. He explained that the reason that he did not continue with the court-ordered drug screens was that he got in a wreck and did not have transportation, which was also his reason for not

completing the home-based case therapy.[3] He stated that he did not complete the home-based case management because the provider "said that everything was good" and "she never called me back." *Id*. at 77. He denied that previously he had been living in the home with Child and paternal aunt, as had been alleged, stating that his sister was not truthful when she made that report to DCS. Father testified that he loved Child, and he asked the juvenile court for an opportunity to visit with her and re-establish a relationship with her.

[19] Upon cross-examination, Father testified that the marijuana in the vehicle in May 2015 was only for his personal use, "but I just took a plea for the dealing charge." *Id*. at 84. He maintained that he "wasn't doing anything to put my daughter in danger besides having it there." *Id*. at 85. On cross-examination, Father conceded that he understood DCS and GAL Donaldson's concern stemming from drug use, he did not do anything on his own to follow up and alleviate concerns about drug use, and he did not pursue drug treatment programs while incarcerated. Father testified that he did not contact FCM Cincebox or DCS between his arrest in May 2015 and his incarceration in February 2016 because he "was just stressed out and just couldn't think right at the time." *Id*. at 86.

---

[3] Father testified that his meetings with the therapist took place in Indianapolis. *Tr*. at 77-78.

The juvenile took the matter under advisement, and on June 13, 2016, the juvenile court issued its Order terminating the parent-child relationship between Father and Child. The juvenile court determined, among other things:

> 32. There is a reasonable probability that the conditions that resulted in [Child's] continued placement outside the home will not be remedied by her father. When not incarcerated, [Father] failed to engage in services and parenting time to an extent demonstrating that he will now come forward and make the required effort if given additional time.

> 33. Continuation of the parent-child relationship poses a threat to [Child's] well-being in that it would pose as a barrier to obtaining a much needed permanency for her after two and one-half years as a ward and through inconsistent placements

> 34. Termination of the parent-child relationship is in the best interests of [Child]. Termination would allow her to be adopted into a stable and permanent home where her needs will be safely met.

> 35. There exists a satisfactory plan for the future care and treatment of [Child,] that being adoption.

*Appellant's App*. at 17. The juvenile court terminated Father's parental rights, and he now appeals.

## Discussion and Decision

As our Supreme Court has recently reiterated, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great

deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* That is, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied.*

[22] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[23]     Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[24]     Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B)  that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)  that termination is in the best interests of the child; and
>
> (D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[25] Father argues that DCS failed to prove the required elements for termination by sufficient evidence and asserts that the juvenile court's conclusions were clearly erroneous. Specifically, he challenges the court's conclusions that (1) the conditions that resulted in Child being removed or the reasons for her placement outside the home would not be remedied, (2) the continuation of the parent-child relationship posed a threat to Child's well-being, (3) termination was in Child's best interests, and (4) there was a satisfactory permanency plan in place for Child.[4]

### *Remediation of Conditions*

[26] In determining whether there is a reasonable probability that the conditions that led to a child's removal or the reasons for placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second,

---

[4] We note that Father does not specifically challenge the juvenile court's factual findings, and Father, therefore, has waived any argument relating to whether these unchallenged findings are clearly erroneous. *In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007), *trans. denied*.

we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.,* 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children,* 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.* In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[27] On appeal, Father argues that DCS did not establish that the conditions that led to Child's removal or placement outside the home will not be remedied, asserting, "To the contrary, the evidence is that the conditions that led to

[Child]'s removal from her Father's care *have* been remedied." *Appellant's Br.* at 15 (emphasis in original). His argument is that the reason for Child's removal from Father's care "was his arrest and detention in May of 2015[,]" for which Father has served his term of incarceration. *Id.* at 20. Therefore, he asserts, "the evidence is that the reasons for L.T.'s removal from Father's care – those being his arrest, criminal charges, and incarceration – *were* remedied and came to an end as of May 29, 2016." *Id.* at 21. We disagree with this analysis and conclusion.

[28] Father's suggestion that the completion of his term of incarceration remedied the concerns and, thus, "the . . . reason for [Child]'s removal from her Father's care no longer exists," *id.*, fails to address the fact that, under the termination statute, "[I]t is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005)*, trans. denied*. Here, after Father was released on bond from his May 2015 arrest, he did not complete drug screens, home-based therapy, or home-based case management as he was ordered to do. FCM Hamblin testified that Father had not made "any progress" with regard to DCS's "original concerns[,]" which were addressed to his sobriety. *Tr.* at 56-57. Indeed, Father had been ordered in September 2014, eight months before the arrest, to submit to random drug screens, and the juvenile court rescinded its authorization for unsupervised parenting time for Father "if he refuses to submit to a drug screen when

requested." *DCS Ex.7*. Father testified that he did not complete the drug screens or therapy because of transportation issues that impeded his ability to get to the required location; however, the evidence presented was that DCS offered and arranged drug screens with providers in Boone and Marion Counties, in order to accommodate Father, but Father did not participate in taking the tests.

[29] Furthermore, in mid-November 2015, Father was ordered to complete a substance abuse assessment. By the time of his February 1, 2016 incarceration, he had not scheduled any assessment, and never did so. His visitation was suspended in late 2015 or early 2016 for his failure to submit to drug screens. As the juvenile court observed,

> [Father] served jail time from February 1, 2016 to May 26, 2016, for his November 2015 convictions. He had approximately five and one-half months to engage in home based case management and therapy, and approximately two and one-half months to undergo a substance abuse assessment, prior to incarceration. He did not do so.

*Appellant's App*. at 17. Father explained that he did not contact FCM Cincebox or DCS between his arrest in May 2015 and his incarceration in February 2016 because he "was just stressed out and just couldn't think right at the time." *Id*. at 86. While Father did complete the Father Engagement program, he did not successfully complete any other recommended or ordered services and did not obtain independent housing.

[30]     We recognize that, for a time, Father was making progress toward reunification. By the end of April 2015, Father had completed sixteen sessions of the Father Engagement Program – although he told FCM Cincebox that it was a waste of his time – and Father was granted in-home trial visits. By the end of May 2015, the juvenile court indicated at a review hearing that it was considering issuing "a temporary custody order" to Father at the next hearing. *DCS Ex*. 8. Later that same day, however, Father was arrested, with Child in the car, after police found marijuana in his vehicle, for which he was later charged and convicted of felony dealing. As Indiana courts have recognized, "Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *K.T.K.*, 989 N.E.2d at 1235-36; *C.T. v. Marion Cnty. Dep't of Child Servs.*, 896 N.E.2d 571, 585 (Ind. Ct. App. 2008), *trans. denied.* Father testified that he was willing to complete services, but, as we have previously stated, "[e]ven assuming that [father] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there was a reasonable probability that the conditions that resulted in Child's removal and continued placement outside the home would not be remedied.

### Threat to Well-Being

[31]     Father also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Child. We need not address the challenge to the juvenile court's conclusion that the continuation of the parent-child relationship posed a threat to Child's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of Child would not be remedied, it is not necessary for us to address any argument as to whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of Child.

### Best Interests

[32]     Father next argues that insufficient evidence was presented to prove that termination was in the best interests of Child. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed*. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper

where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)). Testimony of the service providers, such as recommendations of the case manager and guardian ad litem, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[33] Here, from the time of her removal in January 2014 to the termination hearing in June 2016, Child had been shifted back and forth at least six times between paternal relatives, maternal relatives, and foster care. The evidence from the providers was that Child's behavioral issues, both in the foster home and at school, improved with her placement with the foster family. She was thriving in that environment and was bonded to the family, including other children in the home. Evidence was also presented that Child needed permanency and stability. FCM Hamblin and GAL Donaldson each testified that termination was in Child's best interests. Father maintains that their testimony was not clear and convincing. However, we cannot reweigh the evidence or judge

witness credibility on appeal. *In re H.L.*, 915 N.E.2d at 149. Based upon the totality of the evidence, we conclude that the juvenile court properly determined that termination of Father's parental rights was in Child's best interests.

### *Satisfactory Plan*

[34]  Father also asserts that DCS failed to establish that it has a satisfactory plan for the care and treatment of Child. For a plan to be "satisfactory," for purposes of the statute, it "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *Lang*, 861 N.E.2d at 374. A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. *Id.* In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *In re A.S.,* 17 N.E.3d at 1007.

[35]  Here, FCM Cincebox testified that in May 2016 Child was thriving in her pre-adoptive foster family environment. FCM Hamblin likewise described that Child was "doing very well" and had "made a lot of progress," and she was bonded with her caregivers. *Tr.* at 55. Dalton, the home-based therapist, testified that Child's behavior issues at school and home had decreased and that Child was "very happy" with the foster family. *Id.* at 48, 51. GAL Donaldson had no safety concerns with the pre-adoptive foster home, which she described as "huge," "clean," and "neat," and she believed Child's needs were being met

and Child was "bonded with everyone" in the home including the children there. *Id.* at 68, 72.

[36] Father's argument on appeal is that DCS's plan was "remarkably general," and witnesses did not have knowledge of and could not testify to specifics of the circumstances of the proposed pre-adoptive home, including the age of the mother or what she does for a living, and that, in contrast, Father is the natural parent, is employed and resides with his parents, and as such "family reunification is available." *Appellant's Br.* at 16, 27. We need not address whether the pre-adoptive mother is a suitable adoptive parent, because that is within the jurisdiction of the adoption court. *In re A.S.*, 17 N.E.2d at 107 (recognizing it is within authority of adoption court, not termination court, to determine whether adoptive placement is appropriate). We conclude that the juvenile court did not err in determining that DCS's plan for Child's care and treatment was satisfactory.

[37] We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[38] Affirmed.

[39] Robb, J., and Barnes, J., concur.